UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| PATOKA VALLEY AIDS COMMUNITY ACTION GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:24-cv-00100-RLY-CSW |
| | ) | |
| CITY OF LOOGOOTEE, INDIANA, | ) | |
| | ) | |
| Defendant. | ) | |

**Memorandum in Support of Motion for Partial Summary Judgment**

**Introduction**

A successful 2023 Pride festival in downtown Loogootee, Indiana led organizers of the festival to seek and receive permission from the City to hold another festival in the same location in 2024. However, after a new administration assumed office in 2024, the City enacted a new ordinance that explicitly revoked the Pride festival's previously issued permit. Undaunted, officers of the plaintiff ("Patoka Valley") applied for a new permit under the new ordinance, only to have the City refuse to issue a decision on the permit application. Instead, after the permit request had been pending for months, the City created yet another ordinance, the Special Events Ordinance, which remains in effect, that flagrantly violates the First Amendment and led to the filing of this litigation. Faced with a pending preliminary-injunction motion, the City agreed to allow Loogootee PrideFest 2024 to occur but only in a location smaller than Patoka Valley had requested. As a result, Patoka Valley had to incur additional expenses to conduct the successful festival. Immediately after the festival, Patoka Valley applied for a permit for PrideFest 2025 to be held again in downtown Loogootee. The permit application has never been ruled upon, even though it has been pending for several months and even though the City has approved requests for other events that subsequently took place in 2024.

[1]

There are no contested material facts in this matter. The City's treatment of Patoka Valley's 2024 PrideFest application and the current Special Events ordinance violate the First Amendment, and Patoka Valley is entitled to declaratory relief to this effect. Patoka Valley is entitled now to be awarded as special damages the additional costs that it incurred in conducting Loogootee PrideFest 2024, with the remainder of its damages to be determined after trial. It is entitled to a permanent injunction against the Special Events ordinance, and the City must be ordered to allow Patoka Valley to conduct Loogootee PrideFest 2025 as Patoka Valley has requested.

<strong>Statement of material facts not in dispute</strong>

## I.      Introduction to Loogootee and the Public Square

Loogootee is a small city in Martin County, Indiana, with a population of approximately 2,600. (Answer to Amended Complaint for Injunctive and Declaratory Relief and Damages ["Answer"], Dkt. 46 at 2 ¶¶ 10-11).[1] In the center of the City, in an area framed by Public Square Street, North Line Street, Main Street, and U.S. 231, is a grassy area containing a fountain. (*Id.* at 2-3 ¶¶ 12, 13). The fountain and the grassy area around it are referred to as the "Public Square." (*Id.* at 3 ¶ 13). The Public Square and the surrounding streets are exclusively public property and have been the site of community events over the years. (*Id.* at 3 ¶¶ 13-14).

## II.     The 2023 Pride festival

In December of 2022, Loogootee Pride, an unincorporated group that is now part of Patoka Valley, received permission from the Loogootee City Council to hold the first Loogootee Pride Festival in the Public Square in June of 2023. (*Id.* at 3 ¶ 15). Pride festivals have become common in communities throughout Indiana and the United States as a way of promoting and celebrating

---

[1]      Patoka Valley's Amended Complaint for Injunctive and Declaratory Relief and Damages is at Docket 45. The City's answer, at Docket 46, does not repeat the allegations of the amended complaint, Docket 45, but responds to each paragraph of the amended complaint by paragraph number. The paragraphs of the answer are therefore referred to without noting the identically numbered paragraphs in the amended complaint.

the LGBTQ+ community and promoting health education. (Declaration of Tracy Brown-Salsman, Dkt. 10-1 ["Brown-Salsman I"] at 2 ¶ 10). This was the purpose of the Loogootee Pride Festival that occurred on June 10, 2023. (*Id.* at 2 ¶¶ 11-12).

The festival featured family-friendly entertainment, food, vendors, and a health fair with free HIV and hepatitis-C testing. (*Id.* at 2 ¶¶ 12-13). Some of the entertainers performed in drag. (*Id.* at 2 ¶ 13). The festival lasted from 10:00 a.m. to 5:00 p.m., was attended by 200 persons, and was considered to be very successful. (*Id.* at 2 ¶¶ 16-17). Entertainers performed on a portable stage, owned by the City, for which Patoka Valley was charged no fee. (*Id.* at 2 ¶ 14; Answer, Dkt. 46 at 3 ¶¶ 17-18). Although streets around the Public Square were partially closed for the 2023 Pride Festival, this did not cause any difficulties with vehicular traffic, as U.S. 231 remained open, and it was easy for vehicles to avoid the closed streets. (Brown-Salsman I at 2 ¶ 15).

## III.     The initial approval for Loogootee PrideFest 2024

Shortly after the 2023 Pride Festival was held, Tracy Brown-Salsman and his husband Tim, residents of Loogootee and members of the Board of Directors of Patoka Valley, requested that the Loogootee City Council allow Loogootee PrideFest to be held on September 7, 2024, in the Loogootee Public Square, again from 10 a.m. to 5 p.m. (*Id.* at 1 ¶¶ 1-2 & 4; 2 ¶ 17). Patoka Valley was the sponsor of the then-planned PrideFest 2024. (*Id.* at 2 ¶ 18). It is an all-volunteer charity that works to raise awareness about HIV/AIDS, promotes HIV and hepatitis-C prevention education, provides testing services, and promotes the health and acceptance of the LGBTQ+ community. (*Id.* at 1 ¶ 3).

The request for permission to hold Loogootee PrideFest 2024 was first made by the Brown-Salsmans in writing to the City Council and was followed with an oral request at the November 2023 City Council meeting. (*Id.* at 3 ¶ 19). The request for the 2023 PrideFest had been made orally to the City Council. (*Id.*). The purpose of PrideFest 2024 was identical to that of the 2023 Pride Festival,

and activities similar to those that occurred during the 2023 festival were planned, including family-friendly entertainers, some of whom would again perform in drag. (*Id.* at 3 ¶ 20). PrideFest 2024 was designed to advance the interests of Patoka Valley in promoting the health of the LGBTQ+ community as well as celebrating the community and giving an opportunity for it and its supporters to come together in a very public, joyful, and affirming way. (*Id.* at 3 ¶ 21). Patoka Valley requested that PrideFest 2024 take place in the Public Square area, as it is the traditional location of public events in Loogootee, and because having the event in the Public Square would make a powerful statement about the equality of LGBTQ+ persons and their events to other events occurring in the center of the City. (*Id.* at 3 ¶ 22). This area is also close to shops and is visible to the general public. (*Id.*). The Brown-Salsmans requested that the streets around the Public Square be partially closed for PrideFest 2024, as they had been for the 2023 Pride Festival. (*Id.* at 3 ¶ 23).

After the Council's approval, numerous organizations stepped forward to contribute to the anticipated cost of PrideFest 2024. (*Id.* at 3 ¶ 25). These organizations included Martin County Tourism, the Community Foundation Partnership of Lawrence and Martin Counties, AIDS Resource Group out of Evansville, and Community Action Leading Loogootee. (*Id.*). Two of the sponsors of the event paid for a billboard on U.S. 231 advertising Loogootee PrideFest 2024. (*Id.* at 4 ¶ 26). And, after the approval, the City of Loogootee added Loogootee PrideFest 2024 to its website's list of City events, noting the date and time of the festival and that it would be on the Loogootee Public Square. (*Id.* at 4 ¶ 27; Att. 1 to Brown-Salsman I, Dkt. 10-1 at 9-11).

## IV. The February 2024 Ordinance, the rescission of permission for the Loogootee PrideFest 2024, and Patoka Valley's ignored new permit request

New City Council members and a new Mayor took office in January of 2024, and the City's current mayor, Brian Ader, has expressed antipathy to the LBTQ+ community. (Brown-Salsman I, Dkt. 10-1 at 4 ¶¶ 28-29). In late 2023 he told the Brown-Salsmans that he did not approve of their "lifestyle". (*Id.* at 4 ¶ 29). He has also reposted anti-LGBTQ+ comments to social media:








(Brown-Salsman I, Dkt. 10-1 at 4 ¶ 30 and 12-13; Individual Deposition of Mayor Brian Ader, Dkt. 24-2 at 6:19 – 14:11 and 28-30, 33-34).[2]

On February 12, 2024, the Loogootee City Council passed Ordinance No. 2024-1 ("the February Ordinance"), which established a procedure for private persons and organizations to

---

[2]    Additional posts are included as exhibits to the Mayor's deposition. (Dkt. 24-2 at 31-32, 35-37).City Council Member Mike Engleman has shared similar social media posts. (Dkt. 24-3 at 7:8 - 9:17 and 30-31).

request the use of City property for events and gatherings. (Dkt. 45-1 at 1[admitted in Answer, Dkt. 46 at 4 ¶ 28]). Under the February Ordinance, requests were required to be reviewed and approved by both the City Council and the Board of Public Works and Safety, a government body consisting of a member of the City Council, the Mayor, and three other persons. (Answer, Dkt. 46 at 5 ¶¶ 32-33).

The February Ordinance stated that the areas that may be made available for events and gatherings include "a. Loogootee City Park; or b. Any other area that may be approved for use after completion of the application review process and final approval by the City Council." (*Id.* at 4 ¶ 29). The February Ordinance provided no standards to guide City officials in determining whether to approve a request in general, whether to approve a request at a location other than Loogootee City Park, or whether/when the City could insist upon a location other than that requested by the applicant. (Dkt. 45-1 at 1-3 ¶¶ 1-11).

The February Ordinance also specifically revoked the permit that the City Council had approved in November of 2023 for Loogootee PrideFest 2024, providing that "[w]ith final passage of this Ordinance, the approval of an event by motion made during the City Council meeting of November 13, 2023, is hereby rescinded." (Answer, Dkt. 46 at 5 ¶ 35). PrideFest 2024 was the only event approved at the November 13, 2023 City Council meeting. (*Id.* at 5 ¶ 36).

The February Ordinance further mandated an $800 fee to use the City's stage and that all persons applying for an event permit provide liability insurance in an amount to be "set by the Board of Public Works and the Common Council, and based upon the nature and size of the occurrence, the duration of the occurrence, and other risk factors that are routinely used by insurance companies in issuing policies for public liability and personal injury coverages."(*Id.* at 5 ¶¶ 37-38). Prior to the 2023 Pride Festival, the City of Loogootee requested that proof of insurance be provided, and the organizers of the Pride festival provided proof that they had a million-dollar liability insurance policy.

[6]

(Brown-Salsman I, Dkt. 10-1 at 4 ¶ 32). Patoka Valley had a similar policy for Loogootee PrideFest 2024. (*Id.* at 4 ¶ 33).

Following the passage of the February Ordinance, the City of Loogootee removed PrideFest 2024 from its events website. (*Id.* at 5 ¶ 37). Shortly after passage of the February Ordinance, Tracy Brown-Salsman, the Vice President of the Board of Directors of Patoka Valley, applied for a permit for Loogootee PrideFest 2024 to be held on September 7, 2024. (Brown-Salsman I, Dkt. 10-1 at 5 ¶ 34; Att. 3 to Dkt. 10-1 at 14-15; Answer, Dkt. 46 at 5 ¶ 39).[3] The application requested use of the stage and also requested the partial closures of the same streets that were closed for the 2023 Pride Festival. (Brown-Salsman I, Dkt. 10-1 at 5 ¶ 36; Att. 3 to Dkt. 10-1 at 14-15).

The Brown-Salsmans attended the regular monthly meetings of the Loogootee City Council in March, April, and May, and although the permit request for Loogootee PrideFest was on the agenda at each meeting, the Council refused to vote on whether to grant the permit. (Brown-Salsman I, Dkt. 10-1 at 5 ¶ 38). Although the City of Loogootee consistently refused to vote on the application for PrideFest 2024, the City announced that Loogootee Summerfest, a three-day festival, would take place on the Public Square beginning on June 20, 2024. (*Id.* at 5 ¶ 39; Answer, Dkt. 46 at 6 ¶ 45). Summerfest, which has taken place in previous years, is attended by thousands of persons and includes broader street closures than occurred both for the 2023 Loogootee Pride Festival and the requested closures for Loogootee PrideFest 2024. (Brown-Salsman I, Dkt. 10-1 at 5 ¶ 40; Answer, Dkt. 46 at 6 ¶¶ 45-46). At no time in the March, April, or May City Council meetings did the Council review an application for Loogootee Summerfest, although it was listed on the City's website as one of the City's upcoming events. (Brown-Salsman I, Dkt. 10-1 at 5 ¶ 41).

On May 25, 2024, New Beginnings Community Church held an "Appreciation BBQ for the

---

[3]    The application lists the sponsoring group for PrideFest 2024 as Loogootee Pride, a group that is part of Patoka Valley, which is now the sponsoring organization for PrideFest 2024. (Brown-Salsman I, Dkt. 10-1 at 5 ¶ 35).

City of Loogootee" in a City-owned parking lot across from the Loogootee City Hall. (*Id.* at 5-6 ¶ 42). Despite the February Ordinance requiring a permit and prior permission for organizations or private persons wishing to hold events on City property, at no time after the passage of the February Ordinance did the Council consider any request for the Loogootee Appreciation Day barbeque at any of its public meetings. (*Id.* at 6 ¶ 43).

## V.    The Special Events Ordinance of June 10, 2024

At its regularly scheduled meeting on June 10, 2024, the City Council once again refused to consider the long-pending permit application for Loogootee PrideFest 2024. (*Id.* at 6 ¶ 44). Instead, with no prior announcement, the City's attorney read aloud a new proposed ordinance, Ordinance No. 2024-04 ("the Special Events Ordinance"), which was designed to replace the February Ordinance. (*Id.* at 5 ¶ 45: Answer, Dkt. 46 at 6 ¶ 50). Written copies of the new Special Events Ordinance were not available to the members of the Council or those in attendance. (Brown-Salsman I, Dkt. 10-1 at 5 ¶ 46). Nevertheless, after the reading of the proposed Special Events Ordinance, the Council suspended its rules and immediately enacted the ordinance. (*Id.* at 6 ¶ 47; Special Events Ordinance, Dkt. 45-3; Answer, Dkt. 46 at 6 ¶ 49).

As noted, the Special Events Ordinance repeals the February Ordinance and regulates "Special Events" which are defined as:

> A temporary planned occurrence on public or private property and involves at least one of the circumstances listed below:
>
> (a) Produced or sponsored by a person or organization for which the event is extraordinary in that it is not ordinarily conducted on a daily or regular normal average use basis as a lawful use of the premises upon which such event is to occur;
> (b) Exclusive use of all or part of City-owned facilities, within the City boundaries, such as buildings, parks, open spaces, streets, parking lots, athletic fields, etc., but does not include normal park shelter rentals;
> (c) Cannot be held completely within the confines of an existing building, park (sic);
> (d) Will involve the temporary closing of a public street, alley, parking lot or public right-of-way;

[8]

(e) Will have over 300 people attending the event (or multiple events as part of a series) on private property, except those situations explained in section C of this chapter;

(f) Will require extraordinary services by any City Department.

(Dkt. 45-3 at 2, Sec. A(5)). Section C of the Special Events Ordinance, referred to immediately above, is entitled "Exemptions" and provides, in its entirety:

1. Funeral processions.

2. Special events for which the sole purpose is to celebrate a federally recognized holiday must comply with the requirements under this ordinance however all fees will be waived and insurance for the event will be provided by the City of Loogootee General Liability policy.

3. Events organized solely by the City must apply, but all fees are waived

(*Id.* at 2, Sec. C).

Under the Special Events Ordinance, therefore, permits must be sought for all special events, except funerals, and must be approved or denied by the "Public Board of Works." Among other things, the Special Events Ordinance:

a. Requires that applications for a permit for a Special Event be filed with the City Clerk with a non-refundable fee no fewer than 45 days prior to the proposed event. (*Id.* at 4, Sec. F(1)(a) and (b)).

b. Allows the City to impose an additional fee that is based in part on the "extraordinary services" that the event will cost, with that term defined as "reasonable and necessary services provided by the city, which specifically result from the special event." This includes such things as "police protection, traffic control, fire monitoring, dedicated paramedic services, park services, and other services necessary to ensure the protection of participants and citizens, the proper functioning of city services and the proper administration of this ordinance and policy." (*Id.* at 1-2, Secs. A(3) & D(1)).

c. States that before the permit is approved, the "police and fire department along with all other departments potentially affected by the proposed special event" must review the application and provide an estimate as to the cost of providing extraordinary services. The department heads have 30 days to provide this estimate once notified of the application. (*Id.* at 3, Sec. D(3)).

d. Provides that all fees, including "extraordinary services," are waived if the event is celebrating a national holiday, in which case the City of Loogootee

[9]

will provide insurance. (*Id.* at 2, Sec. C(2)).

e.  Provides that the Clerk is to present the permit application to the Public Board of Works for review "as soon as practical after the Special Event permit application is submitted." (*Id.* at 6, Sec. F(6)(ii)).

f.  Provides that the areas of the City of Loogootee available for a Special Event are "the Loogootee City park" and "[a]ny other area that maybe (*sic*) approved for the use after completion of the application review process and final approval by the city of Loogootee." However, the Special Events Ordinance contains no standards for the City to determine whether to allow or require the event at a location other than the Loogootee City Park. (*Id.* at 4, Sec. F(d)(5)).

g.  Provides that the organizer of any proposed Special Event must provide "personal data" information, with "organizer" defined as "the applicant and any other individual who assists in the planning, arrangement, or organization of any special event." "The police chief or designee will review" this "to determine if the applicant poses a risk to the public." This is reported to the City Clerk who then reports the findings to the Board of Public Works for its consideration. (*Id.* at 2 and 5, Secs. (A)(4) and F(11)).

h.  Provides that applicants must submit the "legal names of all employees, volunteers, and hired volunteer entertainers who are responsible for the supervision or care of minors or whose duties would require close contact and/or alone time with minors at the event." And the applicant must verify that they have checked the names against the national sex offender registry, and they must disqualify the names of anyone on that list. There is no definition of "close contact."(*Id.* at 5, Sec. F(15)).

i.  Lists reasons that a permit can be denied, including:

   - "[C]onsiderations of the health, safety and welfare of the community." (*Id.* at 6, Sec. F(6)(vi)).

   - "The intended Special Event use or activity would present a grave or unreasonable danger to the health or safety of the persons expected to participate in the event, the neighborhood in which the event will occur, the community as a whole, or the city property or resources required to be involved with the proposed event." (*Id.* at 7, Sec. F(6)(v)(11)).

   - "[U]pon receipt of the results of the investigation from the Police Chief deeming the applicant(s) a risk to the public." (*Id.* at 7, Sec. F(6)(v)(14)).

j.  Provides that the "Public Board of Works will approve or deny special event permit applications and place conditions upon any permit. Applicants will be notified of the decision within 10 business days." However, there is no requirement that the Board decide the application within a specified time

period. (*Id.* at 7, Sec. F(6)(v)(15)).

k.  Requires that an applicant for an event hosting more than 200 people or one involving a road closure provide insurance coverage with "minimum combined single limits for bodily injury and property damage of at least one million per person aggregate." (*Id.* at 7-8, Sec. H)).

l.  Prohibits a permit holder from allowing any sound created by the Special Event "to carry unreasonably beyond the boundaries of the special event." (*Id.* at 4, Sec. E(5)).

m.  Allows an approved event to be cancelled by the Mayor without prior notice or, in the absence of the Mayor, by the Police Chief and Fire Chief acting jointly, if there has been "any significant change in conditions which would or may adversely affect the public health or safety," which includes not just an "Act of God, War or pandemic," but also "if applicant's proposed activities would place facilities, grounds, or other natural resources at risk of damage or destruction." (*Id.* at 8, Sec I).

n.  Requires that applicants sign an indemnity agreement that the applicant will indemnify Loogootee and hold it harmless for any matters "arising in any way as a consequence of the granting of a permit." (*Id.* at 7, Sec. G).

The Council voted to make the Special Events Ordinance effective July 1, 2024, after Summerfest, even though the ordinance was enacted before Summerfest took place. (Answer, Dkt. 46 at 7 ¶ 53).

## VI.  The approval of the permit for Loogootee PrideFest 2024 and the additional costs incurred by Patoka Valley

After the Special Events Ordinance was enacted, Patoka Valley, showing persistence, filed yet another application for PrideFest 2024 to take place on September 7. (*Id.* at 7 ¶ 54; Dkt. 45-4 [the application as admitted in Answer, Dkt. 46 at 7 ¶ 54]). Patoka Valley requested that the festival take place around the Public Square and that parts of Line, Main, and Public Square Streets be closed – the same streets that were closed for the 2023 Pride festival, that had been previously approved, and that had been requested to be closed in its February 2024 application. (Dkt 45-4 at 2; Supplemental Declaration of Tracy-Brown Salsman ("Salsman II"), Dkt. 50-1 at 1 ¶¶ 3-4). The City also closed those same portions of Main and Line Streets for Summerfest in June of 2024, in addition to other

streets. (Answer, Dkt. 46 at 7 ¶ 59; Brown-Salsman II, Dkt. 50-1 at 2 ¶ 10).

This action was filed on June 13, 2024, and with a preliminary-injunction motion pending (Dkts. 1, 5, 26 & 31), the City Council on August 26, 2024 voted to grant Patoka Valley the permit to hold PrideFest 2024 (Answer, Dkt. 46 at 7 ¶ 56; Brown-Salsman II at 1, ¶ 5). Although the City allowed the festival to be held in the Public Square area, it did not allow all the streets to be closed as Patoka Valley had requested. (Answer, Dkt. 46 at 7 ¶ 58; Brown-Salsman II, Dkt. 50-1 at 1 ¶ 6). The City specifically did not allow Main Street and a portion of Line Street to be closed. (Brown-Salsman II, Dkt. 50-1 at 1-2 ¶¶ 6-9, and at 7). The Mayor stated that Main Street could not be closed because of traffic concerns, although that did not prevent the City from closing Main Street for Summerfest and for other events. (Id. at 2 ¶ 12).

It was important that Main Street be closed as Patoka Valley had a supporter living on Main Street who would have allowed the festival to receive electricity from her home by running extension cords, taped down, across Main Street as it would be closed to vehicles. (Id. at 2 ¶ 11). This could not be done if the street was open to traffic. (Id.). The City had provided electricity without charge for the 2023 Pride festival, allowing outlets to be used that were near the fountain in Public Square, but this was not allowed for PrideFest 2024. (Id. at 2 ¶ 13). In fact, the City placed locks on the outlets so they could not be used. (Id.).

PrideFest 2024 took place from 10:00 a.m. to 5:00 p.m. on September 7, 2024. (Id. at 3 ¶ 19). It was successful and was attended by approximately 350 persons. (Id.). However, because the City refused to close the streets requested by Patoka Valley, the organization incurred additional expenses. (Id. at 2-3 ¶¶ 13-18). Because Main Street was not closed, Patoka Valley was unable to obtain free electricity. (Id. at 2 ¶¶ 13-15). Patoka Valley therefore had to rent two electric generators at a cost of $369.81 and had to expend $37 in gasoline costs to travel to and from Evansville to rent one of the generators. (Id. at 2 ¶¶ 14-15 and at 9-11). Additionally, Patoka Valley had to pay the City $200 for

barricades placed on the streets that were closed, even though there is no mention in the Special Events Ordinance about such a fee. (*Id.* at 2 ¶ 16, and at 8). Patoka Valley also paid $800 for use of the stage, a charge that would not have been assessed if the event had been organized by the City or if it were deemed to celebrate a federally recognized holiday. (*Id* at 3 ¶ 17, and at 12; Dkt. 45-3 at 2, Sec. C).

The fact that Main Street was open created other problems for Patoka Valley. (Brown-Salsman II, Dkt. 50-1 at 3 ¶ 20). If Main Street had been closed, the stage would have been set up on the corner of Main and Line Streets, as it was for the 2023 Pride festival and for Summerfest. (*Id.* at 3 ¶ 20). Because this space was not available, the stage had to be placed directly in front of New Beginnings Church, whose Pastor has been an opponent of the Pride festival; not an ideal location. (*Id.* at 3 ¶ 21). Additionally, if Main Street had been closed, the portable toilets rented for the festival would have been in a more remote location, but with Main Street open, the toilets were basically in the middle of the festival. (*Id.* at 3 ¶ 22). This made for a less pleasant experience. (*Id.*). During the 2023 festival, with Main Street closed, the Knights of Columbus, located on Main Street, was open and available to adults who wanted an adult beverage, and it was easy for festival participants to travel there as the street was closed. (*Id.* at 3 ¶ 23). With the street open, it was more difficult for festival participants to access this amenity. (*Id.*). With Main Street open, space was much tighter for 2024 PrideFest. (*Id.* at 3-4 ¶ 24). Patoka Valley anticipates that the festival will grow each year, and with Main Street open, there is no room to grow. (*Id.*). This is a matter of concern as Patoka Valley plans for the 2025 festival. After all, there were 200 persons attending in 2023 and 350 in 2024. (*Id.*).

## VII.    The pending application for Loogootee PrideFest 2025

As noted, the Special Events Ordinance remains in effect. (Answer, Dkt. 46 at 8 ¶ 67). Therefore, on September 9, 2024, Patoka Valley filed a permit application for Loogootee PrideFest 2025 for the area around the Public Square. (Brown-Salsman II, Dkt. 50-1 at 4 ¶ 25; Answer Dkt. 46

at 8 ¶ 64 [admitting Exhibit 6 to the Amended Complaint (Dkt. 45) – the September 9, 2024 application]). After submitting the application, Patoka Valley was notified that 2025 applications "for special events are on hold until the city has created final fee lists and ordinance (sic) regarding special events." (Answer, Dkt. 46 at 8 ¶ 65). Nevertheless, the City approved a number of events that occurred on and around the Public Square in 2024. (Brown-Salsman II, Dkt. 50-1 at 4 ¶ 28).

Patoka Valley intends  Loogootee PrideFest to be an annual tradition and desires to hold PrideFest every year in the Public Square area where the original Pride festival was held. (*Id.* at 4 ¶ 30). It will continue to have volunteers and entertainers who support its advocacy and educational goals. (*Id.* at 5 ¶ 31). Patoka Valley may not know the names of some of them until the days of the future festivals. (*Id.* at 5 ¶ 32).

## Legal Standard

The standard for the granting of summary judgment in the Seventh Circuit is clear:

> [S]ummary judgment is warranted only if there is no genuine issue as to any material fact and [] the moving party is entitled to a judgment as a matter of law.

> The initial burden to production rests upon the moving party to identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. Once the moving party satisfies this burden, the nonmovant must set forth specific facts showing that there is a genuine issue for trial . . . . If no genuine issue of material fact exists, the sole question is whether the moving party is entitled to judgment as a matter of law.

*Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 978 (7th Cir. 1996) (internal citations and quotations omitted).

## Argument

### I.    The Special Events Ordinance is unconstitutionally overbroad

#### A.    Regulation of First Amendment expression may not be substantially overbroad

Attempts to regulate First Amendment expression cannot be substantially overbroad. As the

Supreme Court has made clear

> [u]nder the First Amendment overbreadth doctrine, an individual whose own speech or conduct may be prohibited is permitted to challenge a statute on its face "because it also threatens others not before the court -- those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid." A statute may be invalidated on its face, however, only if the overbreadth is "substantial."

*Bd. of Airport Comm'rs of the City of Los Angeles v. Jews for Jesus, Inc.,* 482 U.S. 569, 574 (1987) (cleaned up). Substantial overbreadth is present if there is "a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." *Members of the City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 801 (1984). Even if the plaintiffs' own First Amendment rights are compromised by the challenged regulation so that "they need not really rely on the overbreadth doctrine to assert their facial challenge . . . . [n]evertheless, the plaintiffs may launch a facial attack on their own behalf if the statute creates an unacceptable risk of suppression of ideas." *Hodgkins ex rel. Hodgkins v. Peterson,* 355 F.3d 1048, 1056 (7th Cir. 2004).

**B.      The Special Events Ordinance is unconstitutional because of its overbreadth**

The term "Special Event," to which the ordinance applies, is defined to include a "temporary planned occurrence on public or private property" that involves, among other things, an event:

> (a)   [p]roduced or sponsored by a person or organization for which the event is extraordinary in that it is not ordinarily conducted on a daily or regular normal average use basis as a lawful use of the premises upon which such event is to occur

(Dkt. 45-3 at 2, Sec. A(5)). The permit must be applied for at least 45 days in advance. (*Id.* at 4, Sec. F(1)(b)). This means that if a person wishes to organize a three-person demonstration, or even a one-person demonstration, on a sidewalk in Loogootee to protest a newsworthy event, they cannot do so without applying for a permit and waiting 45 days, not to mention complying with all other

requirements of the Special Events Ordinance.[4] It also means that if a family wants to have a small family reunion picnic in Loogootee City Park, it is a Special Event and they also must comply with all the terms of the Special Events Ordinance, including applying for a permit 45 days before they can eat. This is flagrantly overbroad and is unconstitutional.

"Permit schemes and advance notice requirements that potentially apply to small groups are nearly always overly broad and lack narrow tailoring." *American-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 608 (6th Cir. 2005). "[A]dvance notice provisions . . . 'drastically burden free speech.'" *Grossman v. City of Portland*, 33 F.3d 1200, 1206 (9th Cir. 1994) (citation omitted). Among other things, they prohibit "[s]pontaneous expression, which is often the most effective kind of expression." *Id.* Thus, the Seventh Circuit has noted that the requirement that all permit seekers apply 45 days in advance, no matter the circumstances, was a clear violation of the First Amendment. *Church of the Am. Knights of the Ku Klux Klan v. City of Gary*, 334 F.3d 676, 683 (7th Cir. 2003). And the court has noted that "[r]equirements that small groups obtain a permit to gather in a traditional public forum frequently fail the narrow tailoring requirement." *Smith v. Executive Dir. of Ind. War Mem. Comm'n*, 742 F.3d 282, 289 (7th Cir. 2014).

It is therefore not surprising that cases are legion concluding that requirements are unconstitutional that mandate a permit be sought under all circumstances and that they be applied for far in advance of events. *See, e.g., City of Dearborn*, 418 F. 3d at 607, 608 (finding a 30-day notice provision to be "invalid on its face" and that applying the permit requirement to small groups is "hopelessly overbroad"); *Cox v. City of Charleston, S.C.*, 416 F.3d 281, 286 (4th Cir. 2005) (permit requirement for small groups facially violates the First Amendment in that it burdens more speech than necessary to advance any legitimate interests); *Douglas v. Brownell,* 88 F.3d 1511, 1524 (8th Cir.

---

[4]    The Mayor conceded this as the 30(b)(6) designate of the City. (*See* Dkt. 24-1 at 31:11 – 33:8). He also testified in a separate deposition in his individual capacity. (*See* Dkt. 24-2 at 4:9-21).

1996) (invalidating a 5-day requirement in a parade ordinance as it "restricts a substantial amount of speech that does not interfere with the city's asserted goals"); *Grossman,* 33 F.3d at 1207 (in finding a permit requirement unconstitutional when applied to a group of 6-8 persons, the court stated that "we simply cannot agree that six to eight people carrying signs in a public park constituted enough of a threat to the safety and convenience of park users . . .to justify the restrictions imposed on their speech here"); *NAACP, Western Region v. City of Richmond*, 743 F.2d 1346, 1357 (9th Cir. 1984) (striking down a requirement that a parade permit be sought at least 20 days in advance of the event and stating that "all available precedent suggests that a 20-day advance notice requirement is overbroad").

There simply is no justification for imposing a 45-day requirement prior to engaging in any expressive activity protected by the First Amendment. This is an unconstitutionally overbroad requirement and the statute is unconstitutional on its face.

## II.    The Special Events Ordinance is both unconstitutional on its face and as applied as it is not content or viewpoint neutral and it lacks narrow tailoring and fails to leave open ample alternative channels of communication

### A.    The First Amendment demands that any permitting requirement for First Amendment expression in a public forum be content and viewpoint neutral, narrowly tailored, and leave open ample alternative channels of communication

The Pride festivals that Patoka Valley has organized and sponsored in Loogootee's Public Square area, and that it wishes to conduct in 2025 and annually thereafter, feature expression designed to celebrate the LGBTQ+ community. It is a cardinal principal that "the First Amendment prohibits the Government from restricting or burdening expression because of its message, its ideas, its subject matter or its content." *Vidal v. Elster*, 602 U.S. 286, 292 (2024) (quotation and citation omitted); *see also, e.g., Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984) (the Supreme Court has recognized a "right to associate for the purpose of engaging in those activities protected by the First Amendment" including the right to assembly); *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65 (1981) (noting that the First Amendment protects "[e]ntertainment, as well as political and ideological speech");

[17]

*Woodlands Pride, Inc. v. Paxton*, 694 F. Supp. 3d 820, 843 (S.D. Tex. 2023) ("a survey of court decisions related to the issue of drag shows reveals little divergence from the opinion that drag performances are expressive content that is afforded First Amendment protection") (and citing cases)). The Pride festivals also take place in an area traditionally recognized as appropriate for First Amendment expression, as streets, sidewalks, and parks have "immemorially" been reserved for expressive conduct. *Hague v. CIO*, 307 U.S. 496, 515 (1939).

The First Amendment allows for reasonable regulations on the time, place, and manner of expression or conduct in a public forum if the regulations are content neutral, narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). "[T]he requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Id.* at 800 (cleaned up). "[T]his standard does not mean that a time, place, or manner regulation may burden substantially more speech than is necessary to further the government's legitimate interests." *Id.*

On the other hand, if a regulation of expression is content based, it is subject to strict scrutiny, requiring that it be narrowly tailored to serve a compelling state interest. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (citations omitted). Similarly, strict scrutiny is also warranted if regulation of speech discriminates based on its viewpoint. *Brown v. Kemp*, 86 F.4th 745, 780 (7th Cir. 2023). "If applying the regulation requires an examination or distinguishing of speech only in service of drawing neutral lines, the statute is considered agnostic as to content. Otherwise, the regulation is considered content-or viewpoint-discriminatory on its face and warrants strict scrutiny." *Id.*

Strict scrutiny "really means what it says." *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 888 (1990). It is "a demanding and rarely satisfied standard." *South Bay United Pentecostal Church v. Newsom*, --U.S.--, 141 S. Ct. 716, 718 (2021) (statement of Gorsuch, J.).

[18]

**B.      The Special Events Ordinance is neither content nor viewpoint neutral**

    **1.      The ordinance is not content or viewpoint neutral, as it applies different standards based solely on the expressive content and viewpoint of the event for which the permit is sought, and it fails strict scrutiny**

The Special Events Ordinance allows for vastly differential treatment of the regulated expression based on the subject matter of the event. An applicant must generally pay fees and insurance, including the "extraordinary services" determined by the City. However, all of this is waived "if the event is celebrating a national holiday." (Dkt. 45-3 at 2). Indeed, in that situation Loogootee will provide the liability insurance in addition to waiving the other fees. (*Id.*).

"A regulation of speech is facially content based under the First Amendment if it targets speech based on its communicative content—that is, if it applies to particular speech because of the topic discussed or the idea or message expressed." *City of Austin, Tex. v. Reagan Nat'l Adver. of Austin, LLC*, 596 U.S. 61, 69 (2022) (cleaned up). If the communicative content of the event in Loogootee celebrates a national holiday, it will receive significantly more favorable treatment from Loogootee. If not, it will not. "Some facial distinctions based on a message are obvious, [and] defining regulated speech by particular subject matter" is a clear example of a content-based regulation of speech. *Reed*, 576 U.S. at 163. The communicative content of the event, and that alone, determines how the Special Events Ordinance treats it.

The Special Events Ordinance also fails viewpoint neutrality. Fees are waived for a Columbus Day celebration as Columbus Day remains a national holiday, 36 U.S.C. § 107, but fees are not waived for an Indigenous People's Day celebration, even if it were to take place on Columbus Day. "A speech regulation is viewpoint-based when it goes beyond general discrimination against speech about a specific topic and instead regulates one perspective within a debate about a broader topic." *Brown*, 86 F.4th at 780.

This content- and viewpoint-based regulation cannot be justified as narrowly tailored to serve

[19]

a compelling governmental interest. Loogootee's only possible interest is to favor a particular type of communication. But Loogootee may not regulate speech "based on hostility—or favoritism—towards the underlying message expressed." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 386 (1992). The Special Events Ordinance is unconstitutional on its face for this reason alone.

### 2. The ordinance also fails content neutrality as many of its key provisions contain no standards to cabin Loogootee's discretion

As the Seventh Circuit has noted, in order "[t]o qualify as 'content neutral,' a permit policy cannot invest 'unbridled discretion' in the person who decides whether a permit will issue because excessive discretion can lead to discriminatory enforcement." *Smith*, 742 F.3d at 289 (citing *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323 (2002); *Forsyth Co. v. Nationalist Movement*, 505 U.S. 123, 130-33 (1992); and *Southworth v. Bd. of Regents of Univ. of Wis. Sys.*, 307 F.3d 566, 578-79 (7th Cir. 2002)). Instead, the discretion of a licensing authority must be guided by objective standards to "provide the guideposts that check the licensor and allow courts quickly and easily to determine whether the licensor is discriminating against disfavored speech." *City of Lakewood v. Plain Dealer Pub'g Co.*, 486 U.S. 750, 758 (1988). Without these "neutral criteria," it is easy for government actors to "suppress[] unfavorable expression." *Id.* at 758, 760 (cleaned up).[5] The failure of discretion to be "guided by objective, workable standards" violates the First Amendment. *Minn. Voters Alliance v. Mansky*, 585 U.S. 1, 21 (2018). The Special Events Ordinance is devoid of necessary and essential standards in numerous respects.

### a. There are no standards to determine whether to grant or deny the permit or to revoke one once issued

---

[5] Some cases have referred to the prohibition against "unbridled discretion" as a stand-alone requirement, separate from content neutrality and the other requirements for a reasonable time, place, and manner restriction. *See, e.g., GEFT Outdoor, LLC v. Monroe Cnty., Ind.*, 62 F. 4th 321, 327 (7th Cir. 2023) (variance procedure must be content neutral, narrowly tailored, leave open alternative avenues for speech, and "not put too much discretion in the hands of government officials" (cleaned up)), *cert. denied*, 144 S. Ct. 96 (2023). Regardless, discretion must be constrained by standards to avoid censorship. *Id.*

The Special Event Ordinance specifies that a permit may be denied based on, among other reasons:

- "[C]onsiderations of the health, safety and welfare of the community." (Dkt 45-3 at 6, Sec. F(6)(v)).

- "The intended Special Event use or activity would present a grave or unreasonable danger to the health or safety of the persons expected to participate in the event, the neighborhood in which the event will occur, the community as a whole, or the city property or resources required to be involved with the proposed event." (*Id.* at 7, Sec. F(6)(v)(11)).

- "[U]pon receipt of the result of the investigation from the Police Chief deeming the applicants a risk to the public." (*Id.* at 7, Sec. F(6)(v)(14)).

It also provides that, once granted, a permit may be revoked if there has been "any significant change in conditions which would or may adversely affect the public health or safety." (*Id.* at 8, Sec. I).

A standard that is based on a government employee determining what is in the interests of the community's "health, safety and welfare," or "public health or safety," is no standard at all. The Supreme Court explicitly noted this in striking down an ordinance that allowed a permit to be denied if the denial was based solely on a purported interest in "the public welfare, peace, safety, health, decency, good order, morals or convenience," as it granted the government "unbridled and absolute power" to deny a permit. *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 149-50 (1969). A "law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." *Id.* at 150-51 (footnote omitted).

And allowing a permit to be denied based on the applicant's "risk to the public" similarly grants unbridled discretion to the police chief and Loogootee. How is the police chief to determine this? Is a 3,000-person classical music festival more or less risky to the public than a 10-person march by a White-supremacist group? The possibility of excessive discretion leading to discriminatory

[21]

enforcement is obvious. *Smith*, 742 F.3d at 289.[6]

**b. There are no time limits as to when a permit decision must be made**

"A valid licensing scheme must [] provide for limits on the time within which the decisionmaker must issue the license." *Gold Diggers, LLC v. Town of Berlin, Conn.*, 469 F. Supp. 2d 43, 55 (D. Conn. 2007). "Like a censorship system, a licensing scheme creates the possibility that constitutionally protected speech will be suppressed where there are inadequate procedural safeguards to ensure prompt issuance of the license." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 226 (1990). "Where the licensor has unlimited time within which to issue a license, the risk of arbitrary suppression is as great as the provision of unbridled discretion. A scheme that fails to set reasonable time limits on the decisionmaker creates the risk of indefinitely suppressing permissible speech." *Id.* at 227.

The Special Events Ordinance contains no requirement establishing a time within which Loogootee must issue a decision on a permit application. Once a permit request is filed, the City Clerk is to forward it to "the Police and Fire Departments, along with all other departments potentially affected by the proposed special event," who are then to forward their estimates as to the costs within 30 days of receiving the notice from the Clerk. (Dkt. 45-3 at 3, Sec. D(3); at 6, Sec. F(6)(i)). Then the City Clerk must forward the application to the Board "as soon as practical," and once the Board rules, applicants are to be notified within 10 business days. (Dkt. 45-3 at 6-7, Secs. F(6)(ii) and F(6)(v)(15)). But the Ordinance is silent as to when the actual decision must be made. The only requirement is that the applicant be notified within 10 business days of whenever the Board

---

[6] Additionally, this provision could be construed to allow a permit to be denied based on past violence or similar behavior. The Seventh Circuit has made clear that such a prior restraint can be justified only if such behavior, "if relevant at all, must be extremely closely related in time and character to the permit for which plaintiff applies. The law does not permit us to infer because a person has resorted to violence on some past occasions that he will necessarily do so in the future." *Collin v. Chicago Park Dist.*, 460 F.2d 746, 754 (7th Cir. 1972).

chooses to rule, and this is only after the Clerk acts "as soon as practical."

The fact that this unbridled discretion in actually making a decision can lead to the suppression of speech is hardly a theoretical risk. After all, Loogootee studiously avoided ruling on the February permit application for PrideFest 2024, successfully running out the clock until the Special Events Ordinance was enacted. And now, even though Patoka Valley applied for a permit for PrideFest 2025 on September 9, 2024, there has still not been a decision.

### c. There are no standards concerning the City's determination as to where an event will occur

The Special Events Ordinance provides that the areas available for a Special Event are "the Loogootee City park" and "[a]ny other area that maybe (*sic*) approved for the use after completion of the application review process and final approval by the city of Loogootee." (Dkt. 45-3 at 4, Sec. F(1)(d)(5)). The ordinance contains no standards as to how Loogootee is to determine whether to allow, or require, events to occur in a location other than the Loogootee City Park or on what streets if a downtown location is approved. When the Mayor of Loogootee appeared as a 30(b)(6) deposition designate and was asked what standards are applied to decide whether or not a permit applicant would be approved to use the Public Square as opposed to the City Park, he responded not by quoting the ordinance, which contains no standards, but by stating that the City would consider the "[n]umber of people, the size, the request for streets being blocked off. There's all – there's several different things. Whether you've got insurance. … restroom facilities." (Dkt. 24-1 at 42:16-24). Of course, these are not standards. Nor do the Mayor's statements explain the fact that Summerfest, with thousands of participants, was allowed to take place in the Public Square area, with many streets closed, while Loogootee balked at allowing PrideFest 2024 to take place on the streets that Patoka Valley had requested, even though the streets had been approved for the 2023 festival and were among those allowed to be closed for Summerfest.

Moreover, Patoka Valley does not wish to hold its Pride festivals in the Park, as it is away

from the center of Loogootee and the Public Square, the area where events have traditionally occurred. Having the event in the Public Square makes a powerful statement of the equality of LGBTQ+ persons and their events to other events occurring in the center of the city. Patoka Valley naturally wishes the events to take place in a location where they are in proximity to the downtown and where they will be noticed. And, given that "[t]he First Amendment mandates that we presume that speakers, not the government, know best both what they want to say and how to say it," Loogootee has no right to arrogate to itself the decision as to where expressive conduct is to occur, even if standards were provided. *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 790-91 (1988). However, there are no standards provided at all.

### d.  <u>There are no standards concerning the "extraordinary expense fee" and it allows for an unconstitutional "hecklers' veto"</u>

The Special Events Ordinance allows a permit fee to be based on a determination of the "extraordinary serves" to be caused by the event. Although the Special Events Ordinance provides that the City will establish "each year a list of standard fees and charges by department which will be used to determine the amount of charges attributed to extraordinary services" (Dkt. 45-3 at 2, Sec. D(1)), there are no standards that cabin Loogootee's discretion in making this determination. All the Special Events Ordinance provides is that City departments will determine a reasonable estimate of the extraordinary service fee, and the permit applicant must pay 50% of that figure prior to the event, with the remainder to be paid after the event. (Dkt. 45-3 at 3, Sec. D(3) - D(5)). Failure to make the pre-payment at least 10 days before the event voids the permit. (*Id.* Sec. D(4)). There are no standards, and this is problematic under the First Amendment for the reasons noted above.

But the Seventh Circuit has also held that this type of subjective fee is facially unconstitutional because it allows the fee to be set based on the anticipated reaction of persons other than the event participants. In *Church of American Knights of Ku Klux Klan*, the court addressed an ordinance governing parades, rallies, demonstrations, and open-air assemblies that allowed a permit fee to be based on a

reasonable estimate by the city of the costs to protect persons and property from any harm that would be caused by the event from hostile listeners. 334 F.3d at 679. This is not meaningfully different from the Special Events Ordinance, which provides that the extraordinary services fee includes all costs incurred by the City, which could include costs incurred in protecting the event attendees or city property from hostile crowds. This is unconstitutional as "the Supreme Court held in *Terminiello v. City of Chicago*, 337 U.S. 1, 4-5 (1949), and the holding has been repeated countless times, that a permit for a parade or other assembly having political overtones cannot be denied because the applicant's audience will riot." *Church of American Knights of Ku Klux Klan,* 334 F.3d at 680-81(cleaned up). This "would be to authorize a 'heckler's veto.' It follows pretty directly that a city cannot in lieu of denying the permit charge the applicant for the expense to the city of reining in the hecklers." *Id.* at 681 (citations omitted).[7] To the extent that the "extraordinary expense" provisions of the Special Events Ordinance allow the setting of the fee to take into account the reactions of others to the event, it is unconstitutional.

*                              *                              *

The Special Events Ordinance is therefore suffused with unbridled discretion. This is particularly problematic given that the Mayor's social media history discloses a clear antipathy towards the LGBTQ+ community. Given this, clear standards are essential so that this apparent bias will not infect the permitting decision. But there are none.

A content-based regulation of speech and expressive conduct is constitutional only if it is narrowly tailored to serve a compelling governmental interest. *Reed*, 576 U.S. at 163. But, not

---

[7]      The Seventh Circuit also recognized that, as with the Special Events Ordinance, the Gary ordinance failed to contain constitutionally adequate standards to determine the fee. It noted that such a fee amounted to an unconstitutional hecklers' veto "[e]ven if the fee is calculated with scrupulous precision by a battalion of cost accountants, But this fee was not and the subjectivity of its calculation is another objection to it given the Supreme Court's hostility to regulations of speech that allow broad discretion ('unbridled discretion' is the favored formula) to the regulators." 334 F.3d at 681. The same is true here.

[25]

surprisingly, cases appear not even to reach the "narrowly tailored" analysis when an enactment is found to grant unbridled discretion to allow or deny activity protected by the First Amendment, instead concluding simply that the grant of unbridled discretion violates the First Amendment. *See, e.g.*, *DeBoer v. Vill. of Oak Park*, 267 F.3d 558, 572-74 (7th Cir. 2001); *see also MacDonald v. City of Chicago*, 243 F.3d 1021, 1026 (7th Cir. 2001) ("It is well established that where a statute or ordinance vests the government with virtually unlimited authority to grant or deny a permit, that law violates the First Amendment's guarantee of free speech.") (citations omitted). This is undoubtedly because legislation that grants unfettered discretion to a decisionmaker can never be narrowly tailored as the discretion can always be cabined by enacting standards relevant to the governmental interest at play. The Special Events Ordinance is unconstitutional.

### C.    The Special Events Ordinance is not narrowly tailored

Even if a regulation of expression is content neutral, the narrow tailoring requirement imposes a burden on the government "of showing that the remedy it has adopted does not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 665 (1994) (quoting *Ward*, 491 U.S. at 799). In doing so, the government "must do more than simply posit the existence of the disease sought to be cured. It must demonstrate the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Id.* at 664 (cleaned up).

As noted above, the fact that the Special Events Ordinance imposes a permit requirement and requires 45-days prior notice for all events renders the entire ordinance void because of overbreadth. It is also not narrowly tailored for precisely the same reason. But the fact that Loogootee has chosen to impose this uniquely cumbersome and bureaucratic-heavy ordinance to regulate events in a municipality of 2,600 is itself not narrowly tailored. For example, the portions of the Ordinance that allow the assessment of a fee for "extraordinary services" are unconstitutional for all the reasons

[26]

noted above. But from the narrow-tailoring perspective, what evidence does the City have to hypothesize that there might ever be an event that produces these extraordinary expenses? More generally, until February of 2024, the City of Loogootee had no ordinance regulating events, but now has a multi-tiered complex procedure that appears to be designed to prevent selected events, including PrideFest 2024, from occurring. What is the possible justification for a community this small to have a permit procedure that is so burdensome? In his deposition, speaking for the City, Loogootee's Mayor candidly admitted that prior events in the Public Square area, including PrideFest 2023, which occurred prior to the challenged ordinance, did not cause any problems or concerns of which the City was aware. (Dkt. 24-1 at 13:24 -14:4). The ordinance is not narrowly tailored.

Section G of the ordinance requires that permit applicants sign an indemnity agreement requiring the applicant to indemnify the City and hold it harmless for any matters "arising in any way as a consequence of the granting of a permit." (Dkt. 45-3 at 7). Such a broad indemnification provision is clearly unconstitutional for a lack of narrow tailoring as "an organization exercising its First Amendment rights may not be held liable for the conduct of a third party 'without a finding that [it] authorized—either actually or apparently—or ratified unlawful conduct.' To hold otherwise would impermissibly burden the plaintiffs' First Amendment rights." *iMatter Utah v. Njord*, 774 F.3d 1258, 1270 (10th Cir. 2014) (quoting *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 931 (1982)). "Requiring permittees to compensate third parties for harm caused by hecklers, counter-protesters, or other persons not part of the permittees' organization restricts substantially more speech" than is permissible. *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1041 (9th Cir. 2009); *see also*, *e.g.*, *Pride v. City of Aurora*, 2023 WL 3569130, at *29 (N.D. Ill. May 18, 2023) (granting a preliminary injunction against a similar indemnification provision).

**D.    The Special Events Ordinance does not leave open ample alternatives**

To be constitutional, a content-neutral regulation of expressive conduct must leave open

[27]

"adequate and ample alternatives to the one prohibited." *Wis. Action Coal. v. City of Kenosha*, 767 F.2d 1248, 1256 (7th Cir. 1985). The Seventh Circuit has stressed that "an alternative must be more than merely theoretically available. It must be realistic as well . . . [and it] cannot totally foreclose a speaker's ability to reach one audience even if it allows the speaker to reach other groups." *Gresham v. Peterson*, 225 F.3d 899, 906-07 (7th Cir. 2000) (citation omitted).

The problem with the Special Events Ordinance is that it does not leave open *any* alternative channels of communication. This is because the term "Special Event," to which the ordinance applies, is defined to include a "temporary planned occurrence on public or private property" that involves, among other things, something that is "[p]roduced or sponsored by a person or organization for which the event is extraordinary in that it is not ordinarily conducted on a daily or regular normal average use basis as a lawful use of the premises upon which such event is to occur." (Dkt. 45-3 at 2, Sec. A(5)(a)). While it is not completely clear what this means, what is clear is that if Patoka Valley finds a private landowner who is willing to host Loogootee PrideFest 2025, it would still need a permit. And a private location "somewhere" is not an adequate alternative. There are simply no alternative channels afforded to Patoka Valley. This is unconstitutional.

### III.   The Special Events Ordinance violates the right to anonymous speech protected by the First Amendment

Section F(1)(d)(15) of the ordinance requires the permit applicant to submit the names of all "employees, volunteers, and hired/volunteer entertainers who are responsible for the supervision or care of minors, or whose duties would require 'close contact' and/or alone time with minors at the event." (Dkt. 45-3 at 5, Sec. F(1)(d)(15)). The volunteers and at least some of the entertainers for the Pride festivals are persons who are participating because of their advocacy of LGBTQ+ interests. Aside from the fact that the term "close contact" is not defined, this violates the right to anonymous speech that, as noted above, the Supreme Court has recognized. *Buckley v. Amer. Constitutional Law Found.*, 525 U.S. 182 (1999); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995). "A speaker's

[28]

'decision to remain anonymous . . . is an aspect of the freedom of speech protected by the First Amendment.'" *Boardley v. U.S. Dep't of Interior*, 615 F.3d 508, 523 (D.C. Cir. 2010) (quoting *McIntyre*, 514 U.S. at 342).

Here, those who wish to volunteer at PrideFest and support its advocacy and educational goals must give up their anonymity—and must do so in a municipality whose leadership has evidenced disdain for the LGBTQ+ community. What is the justification for this? Loogootee's presumption appears to be that sex offenders will flock to volunteer or entertain at events. But, without any evidence of this being a real concern, this requirement imposes a huge burden on events that utilize a large number of volunteers and participants. It is not designed in any way to meet an identified problem and it is unconstitutional because it violates the right to anonymous speech.[8]

## IV.    Patoka Valley is entitled to a permanent injunction against the Special Events Ordinance and an award of its special damages, with the remainder of its damages to be determined at trial

The Special Events Ordinance is unconstitutional. Patoka Valley is entitled to a declaratory judgment to this effect and a permanent injunction preventing the ordinance from being enforced. It is also entitled to its special damages arising from the City's treatment of the 2024 PrideFest.

Of course, damages may be awarded through summary judgment if they are uncontested. *See, e.g., Balshe LLC v. Ross*, 625 Fed. App'x 770, 774-75 (7th Cir. 2015). Here, Patoka Valley has general damages that will await trial for determination. But it also has special damages that are uncontested and can now be awarded through summary judgment. While is true that Patoka Valley was able to have PrideFest 2024 on the date that it had requested,  it was not able to have the streets closed as

---

[8]    Although it is not necessary to analyze the denial of the right to anonymous speech here from the perspective of a reasonable time, place, and manner restriction, clearly the disclosures required by the Special Events Ordinance are not narrowly tailored to promote a substantial government interest and they burden substantially more speech that is necessary to further any legitimate interest. *Ward*, 491 U.S. at 800. After all, Patoka Valley may not know the identity of persons until they show up for the festival as they may be recommended by others. (Dkt. QQ-1 at 5 ¶ 32).

requested and as a result, it had to pay an extra $406.81 because of the lack of free electricity that would have been available to it had the requested streets been closed. A $200 charge for barricades was also assessed, despite the fact that there is nothing in the Special Events Ordinance allowing for this charge. This is another example of the unconstitutional lack of standards that saturates the ordinance, and Patoka Valley is entitled to reimbursement of this charge. And while the ordinance does allow for the $800 charge for the stage that Patoka Valley paid for, that is a charge that would have been waived if PrideFest were deemed to be celebrating a federally recognized holiday. (Dkt. 45-3 at 2, Sec. C(2)). This differential treatment is, as demonstrated above, content-based discrimination and is unconstitutional. Given this, and the fact that the ordinance is void, Patoka Valley is entitled to be reimbursed the $800 as well and is entitled to its special damages of $1,406.81.

**Conclusion**

The Special Events Ordinance is unconstitutional on its face and as applied to Patoka Valley. It must therefore be permanently enjoined. Given that there is currently no constitutional ordinance in place, Patoka Valley must be enjoined to allow PrideFest 2025 to occur on the date, time, and location that Patoka Valley requested in its September permit request. Application of the unconstitutional ordinance to Patoka Valley's PrideFest request in 2024 caused Patoka Valley to expend moneys that it would not otherwise have expended and Patoka Valley is now entitled to judgment in that amount, $1,406.81. Patoka Valley is entitled to partial summary judgment on the above points and is entitled to a trial solely to demonstrate its further entitlement to damages.

Kenneth J. Falk
Stevie J. Pactor
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059
kfalk@aclu-in.org
spactor@aclu-in.org

Attorneys for Plaintiff

[30]