UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| PATOKA VALLEY AIDS COMMUNITY ACTION GROUP, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 3:24-cv-00100-RLY-CSW |
| CITY OF LOOGOOTEE, INDIANA, | ) ) ) | |
| Defendant. | ) | |

**ENTRY GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

In 2023, Defendant, the City of Loogootee, Indiana, ("the City") had its first Pride festival. Since then, Plaintiff Patoka Valley AIDS Community Action Group, Inc., ("Patoka Valley") has sought to make Pride an annual event in the City's public square, and the City has sought to regulate how and where special events, such as Pride, occur in the City. In 2024, the City adopted an ordinance requiring those who want to host a special event in the City to obtain a permit. In 2025, it amended that ordinance. In Patoka Valley's view, both the prior and current version of the City's special events ordinance violate the First Amendment.

Now, Patoka Valley moves for partial summary judgment on its First Amendment claims under 42 U.S.C. § 1983 against the City. It seeks a permanent injunction and an award of special damages. For the reasons explained below, the court **GRANTS in part** and **DENIES in part** Patoka Valley's motion.

1

## I.    Statement of Facts

### A.    Evidentiary Motions

First, the court briefly addresses the parties' evidentiary motions.  Both parties ask the court to consider affidavits submitted in support of or in opposition to Patoka Valley's preliminary injunction motion when ruling on the motion for summary judgment.  These motions (Filing Nos. 72, 78) are **GRANTED**.  Therefore, the court will consider Tracy Brown-Salsman's Fourth Supplemental Declaration (Filing No. 70-1) and Brian Ader's Supplemental Affidavit (Filing No. 88) as necessary in resolving the motion for summary judgment.  Additionally, Patoka Valley moves to strike a paragraph from Brian Ader's Affidavit.  Because the court does not consider this paragraph in reaching its conclusion, Patoka Valley's motion (Filing No. 76) is **DENIED as MOOT**.

### B.    Relevant Background

Patoka Valley is an all-volunteer charitable organization in Indiana that raises awareness about HIV/AIDS, provides health-related education and testing services, and "promotes the health and acceptance of the LGBTQ+ community."  (Filing No. 10-1, First Brown-Salsman Decl. ¶ 3).  Tracy Brown-Salsman and his husband Tim Brown-Salsman are members of Patoka Valley's Board of Directors and residents of Loogootee, Indiana.  (*Id.* ¶¶ 1–2, 4).

Loogootee is a small city in Martin County, Indiana, with a population of around 2,600 people.  (Filing No. 46, Answer ¶¶ 10–11).  In the center of the City, there is a grassy area with a fountain that is framed by Public Square Street, North Line Street, Main Street, and U.S. 231.  (*Id.* ¶¶ 12–13).  This area is referred to as the "Public

Square."  (*Id.* ¶ 13).  The Public Square and its surrounding streets are public property and have hosted various community events over the years.  (*Id.* ¶¶ 13–14).

In 2022, on behalf of an organization called Loogootee Pride, the Brown-Salsmans orally requested permission from the Loogootee City Council ("City Council") to host a Pride festival.[1]  (*See* First Brown-Salsman Decl. ¶¶ 8–9, 19).  In December 2022, the City Council gave Loogootee Pride permission to do so.  (*Id.* ¶ 8).  The festival occurred on June 10, 2023, from 10:00 a.m. to 5:00 p.m. in the Public Square.  (*Id.* ¶¶ 8, 12, 17).  Around 200 people attended the festival, which featured family-friendly entertainment (including drag performances), food, vendors, and a health fair.  (*Id.* ¶¶ 12–13, 16).  Streets around the Public Square, other than U.S. 231, were partially closed for the event. (*Id.* ¶ 15).

Shortly after the 2023 Pride festival, the Brown-Salsmans asked the City Council for permission to hold Loogootee PrideFest ("PrideFest 2024") on September 7, 2024, from 10:00 a.m. to 5:00 p.m. in and around the Public Square, with surrounding streets (other than U.S. 231) partially closed.  (*Id.* ¶¶ 17, 23).  They made this request in writing and orally before the City Council.  (*Id.* ¶ 19).  They wanted PrideFest 2024 to take place in the Public Square because events in Loogootee "generally take place" there and because it "makes a powerful statement" that LGBTQ+ events are equal to other events that have occurred in the Public Square.  (*Id.* ¶ 22).  Furthermore, the Public Square is "close to shops" and "more visible to the general public."  (*Id.*).

---

[1] Pride festivals are a common way of "celebrating the LGBTQ+ community and promoting health education" in the United States.  (First Brown-Salsman Decl. ¶ 10).

At its November 13, 2023, meeting, the City Council approved the Brown-Salsmans' PrideFest 2024 request. (*Id.* ¶ 24). "PrideFest 2024 was the only event approved at th[is] meeting." (*Id.*).

### C.    February 2024 Ordinance

In January 2024, a new mayor and several new City Council members took office. (*See id.* ¶ 28). In February 2024, the City Council passed Ordinance No. 2024-1 ("February Ordinance"), which set forth procedures for requesting use of City property for events. (Answer ¶ 1). The ordinance also revoked the City Council's prior approval of PrideFest 2024. (*Id.* ¶ 35).

Tracy Brown-Salsman applied for a permit for PrideFest 2024 under the February Ordinance. (First Brown-Salsman Decl. ¶ 34, Ex. 3). This application was on the City Council's agenda for its March, April, and May meetings, but it never ruled on the application. (*Id.* ¶ 38; Filing No. 24-1, 30(b)(6) Dep. at 17).

At some point, Loogootee Pride became part of Patoka Valley, which became the sponsor of PrideFest 2024. (First Brown-Salsman Decl. ¶¶ 18, 35).

### D.    2024 Ordinance

In June 2024, the City Council adopted Ordinance 2024-04 ("2024 Ordinance"), which repealed the February Ordinance. (*Id.* ¶¶ 44–45, 47; Filing No. 45-3, 2024 Ordinance). The 2024 Ordinance took effect on July 1, 2024. (*See* First Brown-Salsman Decl. ¶ 48). The 2024 Ordinance regulated "special events," which it defined in Section A-5 as any "temporary planned occurrence on public or private property" involving "at least one of the [following] circumstances":

4

(a) Produced or sponsored by a person or organization for which the event is extraordinary in that it is not ordinarily conducted on a daily or regular normal average use basis as a lawful use of the premises upon which such event is to occur;

(b) Exclusive use of all or part of City-owned facilities, within the City boundaries, such as buildings, parks, open spaces, streets, parking lots, athletic fields, etc., but does not include normal park shelter rentals;

(c) Cannot be held completely within the confines of an existing building, park;

(d) Will involve the temporary closing of a public street, alley, parking lot or public right-of-way;

(e) Will have over 300 people attending the event (or multiple events as part of a series) on private property, [with certain exceptions];

(f) Will require extraordinary services by any City Department.

(2024 Ordinance § A-5).

Under Section F-1(d)(5) of the 2024 Ordinance, the "areas of the city that [were] available" to host a special event were "Loogootee City [P]ark" ("City Park") and "[a]ny other area that maybe [sic] approved for use after completion of the application review process and final approval by" the City.  (*Id.* § F-1(d)(5)).

Under the 2024 Ordinance, applications for a special event permit had to "be filed with the City Clerk . . . no less than 45 days prior to the proposed event."  (*Id.* § F-1(b)). "As soon as practical after" the application was submitted, the City Clerk would present the application to the City's Public Board of Works ("Board") for consideration.  (*Id.* § F-6(ii)).  The 2024 Ordinance set forth various criteria the Board could consider in granting or denying the permit, including "the health, safety, and welfare of the community" or "the anticipated costs of holding such an event."  (*Id.* § F-6(v)).  After reviewing the

application, the Board would "move to approve, conditionally approve or deny the application." (*Id.* § F-6(ii)). The Board was then required to notify applicants "of the decision within 10 business days." (*Id.* § F-6(v)(15)).

Once the 2024 Ordinance was enacted, Patoka Valley submitted a permit application for PrideFest 2024. (First Brown-Salsman Decl. ¶ 55; Filing No. 45-4, PrideFest 2024 Application). Patoka Valley proposed that PrideFest 2024 would be held from 10:00 a.m. to 5:00 p.m. on September 7, 2024, in the Public Square. (PrideFest 2024 Application at 1–2; *see* First Brown-Salsman Decl. ¶¶ 55, 57). It asked that parts of Line Street, Main Street, and Public Square Street be closed for the event. (PrideFest 2024 Application at 2; Filing No. 50-1, Second Brown-Salsman Decl. ¶ 3).

On August 26, 2024, the City Council granted Patoka Valley's permit to hold PrideFest 2024. (Answer ¶ 56; Second Brown-Salsman Decl. ¶ 5). It allowed PrideFest to take place in the Public Square, but it did not close the streets as Patoka Valley requested. (Second Brown-Salsman Decl. ¶¶ 5–6). Specifically, it did not close Main Street and part of Line Street. (*Id.* ¶¶ 6–9, Ex. 1). Patoka Valley contends that it encountered several issues executing PrideFest 2024 because Main Street was not closed. (*See id.* ¶¶ 11, 14–15, 21–23). Nevertheless, PrideFest 2024 took place on September 7, 2024, and was attended by approximately 350 people. (*Id.* ¶ 19).

### E.    2025 Ordinance

Shortly after PrideFest 2024, on September 9, 2024, Patoka Valley applied for a permit for PrideFest 2025, to be held on September 6, 2025. (*Id.* ¶ 25; Filing No. 45-6, PrideFest 2025 Application). It proposed that PrideFest 2025 take place from 10:00 a.m.

to 7:00 p.m. on September 6, 2025, in the Public Square.  (PrideFest 2025 Application at 1–2, 12).  It requested that Public Square Street, part of Main Street, and part of Line Street be closed for the event.  (*Id.* at 2, 12; *see* Second Brown-Salsman Decl. ¶ 26).[2]

On January 13, 2025, the City Council passed Ordinance No. 2025-1 ("2025 Ordinance"), which amended the 2024 Ordinance.  (Filing No. 63-1, 2025 Ordinance).  For example, it made the following changes to the 2024 Ordinance:

- Section A-5(a) now only covers events "which will have at least fifteen (15) people attending the event."  (*Id.* at 1; *see* 2024 Ordinance § A-5).[3]

- Section F-1(d)(5) now provides that the only "areas of the city that are available" to be "[t]he location of [a] proposed [special] event" are (1) the City Park and (2) "the Green Space Area located in downtown Loogootee." (2025 Ordinance at 1).  "An applicant may choose either location so long as the anticipated size of the event does not create an unsafe environment for the attendees of the event." (*Id.*).  "If both locations cannot safely contain the number of expected attendees and vendors, the Green Space Area shall be used along with streets around or near said Green Space." (*Id.*).

- Section F-6(v)(15) now provides that the Board "will approve or deny special event permit applications within forty-five (45) days . . . .  The applicant will be notified of the decision within ten (10) business days." (*Id.* at 2).

---

[2] Initially, Patoka Valley also requested that part of North Street be closed as well.  (PrideFest 2025 Application at 12).  It has since withdrawn that request.  (*See, e.g.*, Second Brown-Salsman Decl. ¶ 26).

[3] Thus, Section A-5(a) now reads:

(a) Produced or sponsored by a person or organization for which the event is extraordinary in that it is not ordinarily conducted on a daily or regular normal average use basis as a lawful use of the premises upon which such event is to occur and which will have at least fifteen (15) people attending the event.

(*See* 2025 Ordinance at 1; 2024 Ordinance § A-5(a)).

The Green Space referred to in Section F-1(d)(5) is a recently renovated green space in the City's downtown that is framed by Railroad Street, N.E. 1st Street, Church Street, and U.S. 231. (Filing No. 70-1, Fourth Brown-Salsman Decl. ¶ 14, Ex. 8; Filing No. 63-2, Third Brown-Salsman Decl. ¶ 6). It is located about two blocks from the Public Square. (Filing No. 65-2, First Ader Aff. ¶ 7). The City Park is a park located about a mile away from the City's downtown area. (Third Brown-Salsman Decl. ¶ 8).

According to Mayor Brian Ader, depending on when a permit application is filed under the 2025 Ordinance, "it would be difficult, if not impossible, for [the] City to review . . . and either approve or deny the application in less than forty five (45) days." (First Ader Aff. ¶ 5). He and members of the City Council and Board hold part-time positions. (*Id.* ¶ 3). Most of these individuals have other full-time employment. (*Id.*). The City Council and Board generally meet only once a month. (*Id.* ¶ 4). That said, they can and do hold special meetings in addition to their regular monthly meetings.[4]

After enacting the 2025 Ordinance, the City Council approved Patoka Valley's permit application for PrideFest 2025 to be held on September 6, 2025. (Third Brown-Salsman Decl. ¶ 3). Although Patoka Valley requested that PrideFest 2025 take place in the Public Square, the City Council only approved PrideFest 2025 to take place in either

---

[4] The court takes judicial notice of the meeting agendas and minutes posted to the City Council's website. *See Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 648 (7th Cir. 2011) (recognizing courts' authority "to take judicial notice of government websites"); *Ambrosetti v. Or. Cath. Press*, 458 F. Supp. 3d 1013, 1016 n.1 (N.D. Ind. 2020) ("[T]he Court may take judicial notice of public record information obtained from an official government website."). The website shows that the City Council and/or the Board held special meetings on June 19, 2024; July 24, 2024; August 26, 2024; November 25, 2024; December 30, 2024; and January 27, 2025. *See City Council*, City of Loogootee, https://loogootee.in.gov/dept/city-council (last visited Aug. 11, 2025).

8

the City Park or the Green Space. (*Id.* ¶ 4). In Patoka Valley's view, neither the City Park nor the Green Space is an appropriate venue for PrideFest 2025. (*See, e.g.*, *id.* ¶¶ 7–11). It wants PrideFest 2025 to take place in the Public Square "because it is the heart of Loogootee," it "is the most visible place in the city to have an event," and many community events have been held there in the past. (*Id.* ¶ 12).

Recently, from June 19 to June 21, 2025, Summerfest, which is an annual City event that draws about 2,000 visitors, took place in the Green Space and other parts of downtown Loogootee. (Fourth Brown-Salsman Decl. ¶¶ 2–3; Filing No. 88, Second Ader Aff. ¶¶ 2–3; 30(b)(6) Dep. at 10, 13). Parts of Line Street, North Street, Public Square Street, Main Street, N.E. 1st Street, Railroad Street, and Church Street were closed for Summerfest. (Fourth Brown-Salsman Decl. ¶¶ 3–7, Ex. 8). Additionally, carnival rides were set up in the Public Square. (*Id.* ¶ 4).

Other facts necessary to resolve this motion will be addressed in the Discussion.

### F.    Procedural Background

Patoka Valley filed this action in federal court on June 13, 2024, asserting violations of the First Amendment. (Filing No. 1, Compl.). On April 23, 2025, Patoka Valley moved for partial summary judgment on its claims against the City. (Filing No. 62). This motion was fully briefed as of June 3, 2025. (*See* Filing No. 68). Shortly thereafter, out of concern that the court would not rule on the summary judgment motion in advance of PrideFest 2025, Patoka Valley moved for a preliminary injunction enjoining the 2025 Ordinance and allowing PrideFest 2025 to take place as Patoka Valley requested in its September 2024 permit application. (Filing No. 70).

9

## II.     Legal Standard

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute about a material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The court views the facts in the light most favorable to the nonmovant and draws all reasonable inferences in the nonmovant's favor.  *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018).

## III.     Discussion

Patoka Valley brings § 1983 claims against the City, asserting violations of the First Amendment.  Patoka Valley now moves for partial summary judgment, arguing that both the 2024 Ordinance and the 2025 Ordinance are unconstitutional.  It seeks an award of special damages that it incurred as a result of the 2024 Ordinance.  It also seeks a permanent injunction (1) enjoining enforcement of the 2025 Ordinance and (2) allowing Patoka Valley to hold PrideFest 2025 on September 6, 2025, in the Public Square as it requested.

### A.     2024 Ordinance

First, Patoka Valley argues that the 2024 Ordinance was unconstitutional for several reasons.  Loogootee does not respond to Patoka Valley's arguments.  This "[f]ailure to respond . . . results in waiver."  *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010).  The court can only assume that Loogootee concedes that the 2024

Ordinance was unconstitutional. *See id.* Patoka Valley is therefore entitled to summary judgment on its claim that the 2024 Ordinance violates the First Amendment.

**B.    2025 Ordinance**

Patoka Valley also argues that the current 2025 Ordinance is facially unconstitutional. Specifically, it argues that the 2025 Ordinance is substantially overbroad and, for the same reasons, lacks narrow tailoring to a significant government interest. In opposition, the City argues that the 2025 Ordinance is not substantially overbroad and is a reasonable time, place, and manner regulation. Having carefully considered the parties' arguments, the court agrees with Patoka Valley.

*1.    Time, Place, and Manner Restrictions*

The government's ability to regulate expressive activity in public forms, such as the Public Square or the City's public parks, is limited. *See Surita v. Hyde*, 665 F.3d 860, 869–70 (7th Cir. 2011). That said, even in public forums, "the government may impose reasonable restrictions on the time, place, or manner of protected speech." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). For example, the government "may impose a permit requirement on those wishing to hold" events in public forums "in order to regulate competing uses," *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130 (1992), or to "ensure the safety and convenience of the people," *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 323 (2002).

Such regulations of speech are constitutionally sound so long as they (1) are content neutral, (2) "are narrowly tailored to serve a significant government interest," and (3) "leave open ample alternative channels for communication." *Ward*, 491 U.S. at 791

(quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)). Patoka Valley argues that the 2025 Ordinance is not narrowly tailored and fails to leave open ample alternative channels for communication.

### a.    Significant Government Interest

As an initial matter, a valid time, place, and manner regulation must serve a significant government interest. *Id.* Loogootee contends that it adopted the 2025 Ordinance to protect public health and safety from "potential adverse effects" of special events. (Filing No. 65, City's Resp. Br. at 12). Preserving public health and safety is undoubtedly a significant government interest. *See, e.g.*, *McCullen v. Coakley*, 573 U.S. 464, 486 (2014); *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 650 (1981); *Knowlton v. City of Wauwatosa*, 119 F.4th 507, 516 (7th Cir. 2024).

### b.    Narrow Tailoring

Further, a valid time, place, and manner regulation must be narrowly tailored to serve the government's interest. *Ward*, 491 U.S. at 791. This requirement "is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Id.* at 799 (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)). The regulation "need not be the least restrictive or least intrusive means of" serving the government's interests, but it may not "burden substantially more speech than necessary to further" those interests. *Id.* at 798–99. The government bears the burden of showing that its regulation is narrowly tailored to its legitimate interests. *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 665 (1994).

12

Patoka Valley advances three arguments why the 2025 Ordinance is not narrowly tailored to the City's interest in preserving public health and safety: (1) the ordinance applies to small groups; (2) the ordinance requires applicants to apply forty-five days in advance and gives the Board forty-five days to issue a decision; and (3) the ordinance geographically limits special events to the City Park or Green Space.  The court addresses each argument in turn.

### i.     Application to small groups

The 2025 Ordinance applies to "special events," which it defines in Section A-5 as "temporary planned occurrence[s] on public or private property" that fall into certain categories.  (2024 Ordinance § A-5; *see* 2025 Ordinance).  Subsection (a), for example, includes temporary planned occurrences that are "[p]roduced or sponsored by a person or organization for which the event is extraordinary," (2024 Ordinance § A-5(a)), and "will have at least fifteen (15) people" in attendance, (2025 Ordinance at 1).  Subsection (c) includes temporary planned occurrences that "[c]annot be held completely within the confines of an existing building" or "park."  (2024 Ordinance § A-5(c); *see* 2025 Ordinance).

Patoka Valley argues that the 2025 Ordinance's definition of "special event" renders the ordinance not narrowly tailored because it requires even small groups to apply for permits.  It contends that, under subsection (c), even a group of two people would be required to apply for a permit if they, for example, planned a two-person protest on a public sidewalk, rather than in an existing building or park.  The City rejects this interpretation, arguing that the 2025 Ordinance only applies to groups of fifteen or more.

Even if the court accepts the City's interpretation of its ordinance, the court still concludes that the 2025 Ordinance's application to groups as small as fifteen renders it constitutionally infirm.

Permitting requirements that apply to small groups almost always lack narrow tailoring. *See Smith v. Exec. Dir. of Ind. War Mem'ls Comm'n*, 742 F.3d 282, 289 (7th Cir. 2014); *Am.-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 608 (6th Cir. 2005). Examples of courts striking down permit requirements that apply to small groups abound. *See, e.g.*, *Am.-Arab Anti-Discrimination Comm.*, 418 F.3d at 608 (reasoning city's interest in public safety and traffic control was "not advanced by the application of" a permit requirement "to small groups"); *Douglas v. Brownell*, 88 F.3d 1511, 1524 (8th Cir. 1996) (expressing doubt that a permit requirement's application to groups of ten or more was "sufficiently tied" to city's interest in public safety); *Knowles v. City of Waco*, 462 F.3d 430, 436 (5th Cir. 2006) ("Other circuits have held, and we concur, that ordinances requiring a permit for demonstrations by a handful of people are not narrowly tailored . . . ."); *Grossman v. City of Portland*, 33 F.3d 1200, 1207 (9th Cir. 1994) ("[W]e simply cannot agree that six to eight people carrying signs in a public park constituted enough of a threat to" safety "to justify the restrictions imposed on their speech here.").

Here, the City's permit requirement applies to groups as small as fifteen. The City does not explain how a group of fifteen people implicates its interest in maintaining public safety in any meaningful way. Instead, the City merely insists that the 2025 Ordinance is constitutional because it does not apply to extremely small groups, such as

groups of two or three people.  *See, e.g.*, *Cox v. City of Charleston*, 416 F.3d 281, 285 (4th Cir. 2005) ("[T]he unflinching application of the Ordinance to groups as small as two or three renders it constitutionally infirm.").  This is unconvincing.  Courts, including the Seventh Circuit, have rejected permit requirements applying to groups of around fifteen people.  *See Smith*, 742 F.3d at 289 (reasoning that a permit requirement applying to groups of fourteen or more was likely not narrowly tailored); *Douglas*, 88 F.3d at 1524 (expressing concern that a permit requirement applying to groups of ten or more lacked narrow tailoring).

Of course, a permit requirement that applies to groups of fifteen might make more sense if the public spaces at issue were "so small that even a relatively small number of people could pose" problems with public safety.  *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1034 (9th Cir. 2009); *see Smith*, 742 F.3d at 289 (explaining that the constitutionality of a "numerical limit on gathering without a permit . . . depends on the specifics of the space at issue").  But the City does not make this argument.  After all, the record reflects that public spaces in the City—for example, the Public Square and the Green Space—have hosted events involving hundreds of people without issue.  (*See, e.g.*, 30(b)(6) Dep. at 13–14 (testifying that Pride 2023 in the Public Square did not "cause any sort of problems or concerns")).

Therefore, the court concludes that the 2025 Ordinance's permit requirement restricts a substantial amount of speech that does not interfere with the City's stated goal of preserving public safety.  Therefore, the court concludes the 2025 Ordinance's application to groups as small as fifteen lacks narrow tailoring.

15

ii.    *Forty-five-day advance notice requirement*

Additionally, the 2025 Ordinance requires applicants to apply for a permit at least forty-five days in advance of their proposed event.  (2024 Ordinance § F-1(b); *see* 2025 Ordinance).  Likewise, it gives the Board forty-five days to issue a decision on a permit application and then ten additional days to notify the applicant of the decision.  (2025 Ordinance at 2).

A city may require permit applicants to apply in advance of a proposed event on public property.  *Church of Am. Knights of Ku Klux Klan v. City of Gary*, 334 F.3d 676, 682 (7th Cir. 2003).  After all, a city "needs some time to decide whether to grant [a] permit and if so whether to impose conditions on the grant."  *Id.*  That said, any advance notice requirement "is a substantial inhibition on speech."  *Am.-Arab Anti-Discrimination Comm.*, 418 F.3d at 605; *see Grossman*, 33 F.3d at 1206.  An advance notice requirement must therefore be reasonable, and its "length . . . is critical to its reasonableness."  *Church of Am. Knights*, 334 F.3d at 682.

Advance notice requirements that apply to small groups and are more than a few days long almost always lack narrow tailoring.  *See, e.g.*, *id.* at 683 (rejecting forty-five-day advance notice requirement); *N.A.A.C.P. v. City of Richmond*, 743 F.2d 1346, 1357 (9th Cir. 1984) (rejecting twenty-day advance notice requirement); *Am.-Arab Anti-Discrimination Comm.*, 418 F.3d at 607 (rejecting thirty-day advance notice requirement); *Douglas*, 88 F.3d at 1524 (rejecting five-day advance notice requirement).

Here, the City requires all applicants to apply for a permit forty-five days in advance of their proposed event.  All available precedent suggests this is not reasonable.

*See, e.g.*, *Church of Am. Knights*, 334 F.3d at 683 (rejecting forty-five-day advance notice requirement).  Nevertheless, the City argues that it needs forty-five days to decide permit applications because it is a small city with limited resources, Board members only work part time, and the Board generally only meets once a month.  This is unconvincing.  *See, e.g.*, *Douglas*, 88 F.3d at 1523–24 (rejecting argument that five-day notice requirement was necessary because of city's "limited resources and small police force").  Although the Board may have limited time and resources, it only receives a few permit applications a year, at most.  (*See* 30(b)(6) Dep. at 30–31); *Cf. Thomas v. Chi. Park Dist.*, 227 F.3d 921, 925–26 (7th Cir. 2000) (approving thirty-day advance notice requirement for Chicago parks where evidence showed authorities were overwhelmed by thousands of permit applications).  And the Board can, and does, hold special meetings more frequently than once a month.  Therefore, such a substantial advance notice requirement "cannot be justified by" the Board's "failure to respond to requests in a more timely fashion."  *Am.- Arab Discrimination Comm.*, 418 F.3d at 606.

In sum, the court concludes that the 2025 Ordinance's advance notice requirement lacks narrow tailoring as well.

### iii.    *Geographical limits*

Finally, under the 2025 Ordinance, special events can only take place in the City Park or the Green Space, unless "both locations cannot safely contain the number of expected attendees and vendors," in which case the Green Space and "streets around or near said Green Space" will be used.  (2025 Ordinance at 1).

Thus, the 2025 Ordinance essentially restricts special events, even those involving groups as small as fifteen, to only two locations. The City does not explain how this furthers its interest in public safety in any way. The City emphasizes that the First Amendment does not entitle Patoka Valley to host PrideFest in the place of its choosing. *See Heffron*, 452 U.S. at 647 ("[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired."). But still, any geographic restriction on speech must be narrowly tailored to a significant government interest. *See Ward*, 491 U.S. at 791; *Marcavage v. City of Chicago*, 659 F.3d 626, 631 (7th Cir. 2011). The City puts forth no argument that the 2025 Ordinance's geographic limit is narrowly tailored. It fails entirely to explain how its interest in public safety "is achieved less effectively without" this geographic limit and "has thus waived the argument." *Horina v. City of Granite City*, 538 F.3d 624, 634 (7th Cir. 2008).

In any event, even if the 2025 Ordinance *sometimes* serves the City's interest in preserving public health and safety by restricting special events involving fifteen or more people to two locations, "it does so at too high a cost, namely, by significantly restricting a substantial quantity of speech that does not impede [the City's] permissible goals." *Cmty. for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1392 (D.C. Cir. 1990).

Thus, the court concludes that the 2025 Ordinance's geographic limitation is also not narrowly tailored to the City's interest. In sum, because of its application to small groups, its forty-five-day advance notice requirement, and its geographic limitation, the 2025 Ordinance burdens substantially more speech than necessary to further its interest in public safety and thus lacks narrow tailoring.

### 2. Overbreadth

Patoka Valley also argues that the 2025 Ordinance is unconstitutionally overbroad. "In the First Amendment context, . . . 'a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021) (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010)). Thus, to be facially unconstitutional, an ordinance's overbreadth must be substantial. *N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 11 (1988).

The court agrees with Patoka Valley. The 2025 Ordinance is unconstitutionally overbroad for the same reasons that it lacks narrow tailoring. The court finds that a substantial number of the 2025 Ordinance's applications are unconstitutional because it requires groups as small as fifteen to apply for permits, requires applicants to apply forty-five days in advance, and limits special events to only two locations in the City. *See, e.g.*, *Am.-Arab Anti-Discrimination Comm.*, 418 F.3d at 608 (noting that "[p]ermit schemes and advance notice requirements that . . . apply to small groups are nearly always overly broad," in addition to not being narrowly tailored).

Patoka Valley is therefore entitled to summary judgment on its claim that the 2025 Ordinance violates the First Amendment.

### C. Requested Relief

#### 1. Special Damages

Patoka Valley requests an award of special damages in the amount of $1,406.81, which it argues it incurred because of the City's enforcement of the unconstitutional 2024

Ordinance.[5]  The court **DENIES** Patoka Valley's request **without prejudice**.  The amount of Patoka Valley's damages will be determined at trial.

### 2. Permanent Injunction

Patoka Valley also requests a permanent injunction (1) enjoining enforcement of the 2025 Ordinance and (2) requiring the City to allow PrideFest 2025 to occur on the date and time and in the location that Patoka Valley requested in its September 2024 permit request.

### a. Permanent Injunction Factors

To obtain a permanent injunction, a plaintiff must first be successful on the merits. *Collins v. Hamilton*, 349 F.3d 371, 374 (7th Cir. 2003).  Then, it must show (1) that it "has suffered an irreparable injury"; (2) "that remedies available at law, such as monetary damages, are inadequate"; (3) "that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted"; and (4) "that the public interest would not be disserved by a permanent injunction."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

As discussed above, Patoka Valley has been successful on the merits of its First Amendment claim that the 2025 Ordinance is unconstitutional.  Because of this, Patoka

---

[5] This amount includes the following: Under the 2024 Ordinance, Patoka Valley paid $800 to use the City's stage for PrideFest 2024.  (Second Brown-Salsman Decl. ¶ 17; 2024 Ordinance § F-1(d)(16)).  The City also required Patoka Valley to pay $200 for barricades to block streets during the event.  (Second Brown-Salsman Decl. ¶ 16).  And finally, Patoka Valley paid $406.81 ($369.81 in rental fees and $37 in gas) renting generators for the event.  (*Id.* ¶¶ 14–15).  If Main Street had been closed for the event, Patoka Valley would have instead obtained free electricity from a supporter who lives on Main Street.  (*Id.* ¶ 11).

Valley easily satisfies the other permanent injunction factors. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion). Additionally, a First Amendment injury is difficult to quantify, making damages an inadequate remedy and an injunction especially appropriate. *Flower Cab Co. v. Petitte*, 685 F.2d 192, 195 (7th Cir. 1982); *Nat'l People's Action v. Village of Wilmette*, 914 F.2d 1008, 1013 (7th Cir. 1990). Furthermore, "injunctions protecting First Amendment freedoms are always in the public interest." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006). Thus, a permanent injunction is appropriate here.

### b.     Severability

Patoka Valley asks that the 2025 Ordinance be enjoined in its entirety. Neither party addresses the issue of severability. Generally, when faced with constitutional flaws in an ordinance, the court prefers to "sever its problematic portions while leaving the remainder intact." *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 328–29 (2006). Therefore, the court will briefly address whether the problematic portions of the 2025 Ordinance—its application to small groups, its advance notice requirement, and its geographic limitation—are severable.

The severability of provisions in "a local ordinance is a question of state law." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 772 (1988). Under Indiana law, to determine whether a provision is severable, the court asks (1) "whether the statute can stand on its own without the invalid provision" and (2) "whether the legislature intended the remainder of the statute to stand if the invalid provision is severed." *GEFT*

*Outdoor, LLC v. Monroe County*, 62 F.4th 321, 331 (7th Cir. 2023) (quoting *City of Hammond v. Herman & Kittle Props., Inc.*, 119 N.E.3d 70, 87 (Ind. 2019)).  "If the answer to either question is no, 'the offending provision is not severable, and the whole statute must be stricken.'"  *Id.* (quoting *Herman & Kittle Props.*, 119 N.E.2d at 87).

In short, the key question here is whether the City would have enacted the 2025 Ordinance "had it been presented without the invalid features."  *Does v. City of Indianapolis*, No. 1:06-CV-865, 2006 WL 2927598, at *10 (S.D. Ind. Oct. 5, 2006) (Young, J.) (quoting *State v. Barker*, 809 N.E.2d 312, 317 (Ind. 2004)).  The answer to that question is clearly no.  The court therefore concludes that it is appropriate to strike the 2025 Ordinance in its entirety.

*c.*    *PrideFest 2025*

Patoka Valley also argues that, because the 2025 Ordinance is invalid, Patoka Valley is entitled to a permanent injunction requiring the City to allow PrideFest 2025 to take place as Patoka Valley requested in its September 2024 permit application—that is, on September 6, 2025, from 10:00 a.m. to 7:00 p.m., in and around the Public Square. Absent any argument to the contrary from the City, the court concludes that this request is appropriate.

*3.*    *Preliminary Injunction*

After moving for summary judgment, Patoka Valley moved for a preliminary injunction enjoining the 2025 Ordinance and allowing PrideFest 2025 to occur as requested.  Given the court's ruling on the summary judgment motion, Patoka Valley's motion for preliminary injunction is **DENIED as MOOT**.

22

## IV.    Conclusion

Patoka Valley's Motion for Partial Summary Judgment (Filing No. 62) is

**GRANTED in part** and **DENIED in part**.  Specifically, the court **GRANTS** Patoka

Valley's motion to the extent that it is entitled to summary judgment on its claims that

Ordinance 2024-04 and Ordinance No. 2025-1 are unconstitutional.  The court also

**GRANTS** Patoka Valley's request for a permanent injunction.  But the court **DENIES**

**without prejudice** Patoka Valley's request for an award of special damages.  The amount

of Patoka Valley's damages will be addressed at trial.

The City is hereby **ENJOINED** from enforcing Ordinance No. 2025-1.  The court

also **ORDERS** the City to allow PrideFest 2025 to take place on September 6, 2025,

from 10:00 a.m. to 7:00 p.m., in the Public Square with Public Square Street, Main Street,

and Line Street to be closed as requested by Patoka Valley.  This injunction will be set

forth in a separate order.  *See* Fed. R. Civ. P. 65(d); *MillerCoors LLC v. Anheuser-Busch*

*Cos.*, 940 F.3d 922, 922 (7th Cir. 2019).

23

Patoka Valley's Motion for Preliminary Injunction (Filing No. 70) is **DENIED as MOOT**.  Patoka Valley's Motion to Submit Additional Evidence Regarding Summary Judgment (Filing No. 72) is **GRANTED**.  Patoka Valley's Motion to Strike a Portion of Mayor Brian Ader's Affidavit (Filing No. 76) is **DENIED as MOOT**.  Finally, the City's Motion to Submit Additional Evidence Concerning Summary Judgment (Filing No. 78) is **GRANTED**.

**IT IS SO ORDERED** this 28th day of August 2025.

_____
RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.